Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MACLEAN TOWNHOMES, LLC, a
Washington limited liability company, as
assignee of American Heritage Builders, a
Washington corporation,

               Plaintiff,

       v.

CHARTER OAK FIRE INSURANCE CO., a
foreign insurance company,

       Defendant and Third-Party Plaintiff,

       v.

FIRST SPECIALTY INSURANCE
COMPANY, a foreign insurance company,

       Third-Party Defendant.

No. C 06-1093-BHS

CHARTER OAK'S RESPONSE TO
FIRST SPECIALTY'S AMENDED
MOTION FOR SUMMARY
JUDGMENT TO DISMISS THIRD-
PARTY COMPLAINT

**NOTE ON MOTION CALENDAR:
JULY 11, 2008**

## I. Relief Requested

Charter Oak requests that the court deny First Specialty's motion to dismiss Charter Oak's contribution claim and its motion for a claim bar. Charter Oak's contribution claim against First Specialty is viable and under the facts of this case the purpose of a claim bar would not be served.

CHARTER OAK'S RESPONSE TO FIRST
SPECIALTY'S AMENDED MOTION FOR
SUMMARY JUDGMENT TO DISMISS THIRD-
PARTY COMPLAINT - 1
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO
DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION

1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

## II. Facts

AHB settled with MacLean for $1.8 million. AHB assigned to MacLean its claims against Charter Oak and First Specialty. MacLean, as assignee of AHB, made claims for the $1.8 million amount of the settlement against Charter Oak and First Specialty. Charter Oak issued two policies to AHB. First Specialty issued one.[1] MacLean settled with First Specialty for $60,000[2] but seeks $1.8 million from Charter Oak.[3]

Charter Oak's contribution claim against First Specialty is for First Specialty's fair share of the liability.

Charter Oak seeks either a recovery from First Specialty or a set-off as against MacLean for settling for less than First Specialty's fair share.

First Specialty takes no position as to the set-off issue.

**1.    Charter Oak's contribution claim against First Specialty is viable and should not be dismissed.**

*a.        First Specialty's factual predicate has been removed.*

First Specialty's argument is based in part on the court's earlier ruling that some property damage occurred during the Charter Oak policy. That ruling has now been vacated.[4]

*b.        The testimony of Mark Lawless as to the timing of the property damage is not competent and should be stricken.*

---

[1] Charter Oak issued policies from August 18, 1999 to August 18, 2001. First Specialty issued policies to AHB from August 18, 2001 to August 18, 2002. First Specialty's amended motion, p. 5. An earlier Charter Oak policy, from August 18, 1998 to August 18, 1999 was dismissed.

[2] Docket #122, p. 29 of 46.

[3] MacLean has not even deducted the $60,000 received from First Specialty.

[4] Docket #134, p. 4 of 4.

CHARTER OAK'S RESPONSE TO FIRST SPECIALTY'S AMENDED MOTION FOR SUMMARY JUDGMENT TO DISMISS THIRD-PARTY COMPLAINT - 2
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION

1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

First Specialty also relies on the testimony of Mark Lawless.[5] Lawless testified in substance that (1) the buildings were constructed with construction defects that allowed water intrusion and (2) water intrusion began causing damage in 2000. Charter Oak's challenge is directed at the second part of his testimony. Specifically, he testified:

> The defects in this siding installation would have begun trapping water behind the buildings' envelopes after AHB and its subcontractor completed these phases. As a result, damage to the underlying wood framing and sheathing likely began in early 2000 for phase 2, and fall 2000 for phase 3, and progressed continuously until it was repaired.[6]

Charter Oak objects to Lawless' testimony as to when property damage began to occur under FRE 702 and *Daubert*[7] because there is no foundation for that testimony. Water intrusion is not the equivalent of property damage.

Judge Robert S. Lasnik of this court ruled on a nearly identical issue in *Dally Properties, LLC v. Truck Ins. Exchange.*[8] That case, like this one, involved "the rate of wood decay and the [timing of the] occurrence of the property damage."[9] The issue there was when the building, although it was still standing, had reached a state of collapse because of substantial structural impairment.[10] Because in this case the issue is the timing of wood decay sufficient to constitute property damage, the evidentiary issue is the same – when did that happen?

---

[5] First Specialty's Amended Motion, p. 5.

[6] First Specialty's Amended Motion, p. 5.

[7] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[8] 2006 WL 5163004 (W.D. Wash.)

[9] *Id.*, p. 1.

[10] *Id.*, p. 5.

CHARTER OAK'S RESPONSE TO FIRST SPECIALTY'S AMENDED MOTION FOR SUMMARY JUDGMENT TO DISMISS THIRD-PARTY COMPLAINT - 3
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION

1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

The court explained that the "central point of disagreement" in that case, "the timing of the occurrence of certain damage to the building" caused by "the decay of the wood," is " by all accounts, difficult to measure, and by some accounts impossible."[11]

The court stated the applicable rules:

> Rule 702 allows an expert opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. *Daubert* clarifies the reliability prong of the rule, explaining that a court should assess reliability by determining whether the approach used can and has been tested, has been subject to peer review, has an identifiable rate of error, and is generally accepted within the community.[12]

*Dally Properties* involved the opinions of two experts. The court held one opinion admissible because it complied with Rule 702 and *Daubert* and one inadmissible because it did not comply. As the court will see, the Declaration of Mark Lawless on which First Specialty relies falls short of even the inadmissible opinion.

As to the opinion found admissible, the court said (the court's opinion is quoted at length to show what is missing from the Lawless declaration):

> Bozick addresses the four *Daubert* inquiries in his report. Bozick Decl. at 3-6. He identifies numerous data points for his tests, including the date of the building's completion, the types of wood, the paths of the water, the state of the decay upon first inspection and the weather during this period. Bozick employs a linear growth model for mold which, although contested by the other experts, has been proven in a lab and described in a scientific publication. Acknowledging the uncertainty of the enterprise of dating the decay, Bozick's diagrams contain ranges that express an expected rate of error. Finally, Bozick asserts that the rate of decay approach that he employs has been accepted within the expert community, citing the previously mentioned publication.

---

[11] *Id.*, p. 1.

[12] *Id.* at 593-94.

CHARTER OAK'S RESPONSE TO FIRST
SPECIALTY'S AMENDED MOTION FOR
SUMMARY JUDGMENT TO DISMISS THIRD-
PARTY COMPLAINT - 4
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO
DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION

1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

Bozick's report is admissible under *Daubert*. The one area of his stipulations that raise the most serious concerns is whether, in fact, there is widespread acceptance in the scientific community of the accuracy of decay estimates dating back more than a year, and whether the linear fungal growth model is accurate. These concerns, however, do not merit exclusion. The other parties will have the opportunity and expert resources of their own at trial to challenge Bozick's methods and conclusions. [13]

Lawless's declaration addresses none of the Rule 702 or *Daubert* requirements. Lawless does not identify, for example, the types of wood, the paths of the water, or whether he employed a linear growth model for mold. And because he does not identify any scientific model for rate of wood decay, he also does not identify an expected rate of error or whether the model has been accepted within the expert community.

As to the opinion found inadmissible, the court said:

Pihl's rebuttal report contains no similar assurances of scientific reliability . . . .

***

. . . Pihl has failed to show that he employed any reliable methodology to arrive at his conclusions. The apparent lack of meaningful scientific input into Pihl's conclusion regarding the rate of decay requires this court to exercise its gatekeeping function to exclude this report.[14]

Like Pihl, Lawless fails to show he employed any reliable methodology to arrive at his conclusions. He says only that when he and his company inspected the buildings in May 2004 they found sheathing and framing "stained and otherwise physically injured" at various locations. But finding "stained and otherwise physically injured" framing and sheathing (even assuming *arguendo* that constitutes "property damage") in May 2004 does not establish property damage existed nearly three years earlier in August 2001 when the last of Charter Oak's two

---

[13] *Id.*, p. 4.

[14] *Id.* p. 4-5

CHARTER OAK'S RESPONSE TO FIRST SPECIALTY'S AMENDED MOTION FOR SUMMARY JUDGMENT TO DISMISS THIRD-PARTY COMPLAINT - 5
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION

1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

years of coverage expired – much less from August 1999 to August 2001 when the policies were in effect. And Lawless has failed to offer the court any reliable scientific model to support his assumption.

A copy of the Lawless declaration is attached for the court's convenience. It is respectfully submitted that the court should strike and disregard Lawless's testimony as to the time at which property damage occurred.

        *c.*     *First Specialty may be liable to Charter Oak for contribution if MacLean prevails on its claim of multiple occurrences.*

First Specialty's motion is predicated on a single continuous occurrence through the Charter Oak policies and the First Specialty policy.[15] But MacLean has argued for multiple occurrences. In its motion for summary judgment, it argued:

> Here, as in U.E. Texas, the property damage at the Condominium occurred at different buildings at different points in time. Like the pipe leaks in U.E. Texas, the leaks that caused the property damage in this case constituted separate "occurrences," . . .[16]

Charter Oak disagrees there are multiple occurrences, but that is MacLean's argument.

If, as MacLean contends, each rain initiates a new process resulting in property damage, then there were new occurrences in the First Specialty policy period. If at trial of this matter, this court ultimately concludes MacLean is correct, First Specialty's policy would be triggered under this theory. But if the occurrences in the First Specialty policy period combined with occurrences in the Charter Oak policy period to cause a single indivisible injury, then First Specialty is jointly and severally liable for the single indivisible injury and Charter Oak has

---

[15] First Specialty's Amended Motion, p. 11.

[16] Plaintiff's Motion for Partial Summary Judgment Re Insurance Coverage, p. 24.

CHARTER OAK'S RESPONSE TO FIRST
SPECIALTY'S AMENDED MOTION FOR
SUMMARY JUDGMENT TO DISMISS THIRD-
PARTY COMPLAINT - 6
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO
DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION
1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

rights of contribution against First Specialty. And in the real world, assuming *arguendo* that water infiltration eventually causes property damage, at any given location that allowed water intrusion, rain at the end of the Charter Oak policy period and rain at the beginning of the First Specialty policy period would combine to produce a single indivisible injury.

Where there is covered property damage and non-covered property damage, an insurer is liable only for the covered property damage, provided it can segregate the covered property damage from the non-covered property damage.[17] Here, however, under the facts of MacLean's multiple-occurrence argument, First Specialty cannot segregate between covered and non-covered property damage. Nor has it even tried to segregate, such as for example with the declaration of a qualified expert, as was its burden on its motion for summary judgment.

First Specialty's motion cannot be resolved until MacLean's argument about the number of occurrences is resolved. Until this court concludes, after consideration of all the evidence presented respecting resulting property damage, if any, that there is only a single occurrence, and also finds that property damage caused by the work of AHB actually occurred before First Specialty's policy period commenced, this court must deny First Specialty's summary-judgment motion.

2.    **The court should not grant a claim bar.**

---

[17] *Waite v. Aetna Cas. & Sur. Co.*, 77 Wn.2d 850, 856, 859 (1970) ("But the appellants earnestly contend that the respondent should be required to reimburse them . . . for all of the amount of the settlement, even though it comprised multiple claims, some of which were covered by the policy and some of which were not. None of the authorities cited by the appellants support this proposition. . . . If the [insurer] could prove that the accident arose out of the fairlead assembly, the claim was not covered."); *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1430 (9th Cir. 1995).

CHARTER OAK'S RESPONSE TO FIRST
SPECIALTY'S AMENDED MOTION FOR
SUMMARY JUDGMENT TO DISMISS THIRD-
PARTY COMPLAINT - 7
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO
DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION

1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

First Specialty has been protected by the settlement in this case and the purpose of a claim bar would not be served.

According to the *Fluck* case cited by MacLean[18] the purpose of a claim bar is to protect the settling insurer from claims for contribution to which it would otherwise be exposed. The court said in relevant part:

> A settling defendant has no assurances that the non-settling defendants won't later seek contribution for any judgment entered in the case. That possibility robs the settlement of its finality and exposes the settling defendant to additional liability. . . .
>
> For that reason, the federal courts have fashioned an equitable doctrine known as a "bar order."[19]

In this case, however, First Specialty is protected by an indemnity and hold harmless in the settlement agreement. The indemnity and hold harmless specifically and expressly includes claims against First Specialty for contribution. It provides:

> **3.3    Indemnification and Hold Harmless.** POLYGON NORTHWEST, MACLEAN TOWNHOMES and AMERICAN HERITAGE further agree to defend, indemnify and hold harmless First Specialty from and against any and all claims by third parties, including but not limited to claims for contribution, subrogation or indemnity, whether contractual, statutory or equitable, by any entity seeking payment or reimbursement from FIRST SPECIALTY for amounts paid by such third party, or to which such party claims to be entitled for any reasons whatsoever arising out of or in any way connected with the Summerhill Village Condominium project.[20]

First Specialty is protected by the indemnity and hold harmless. It is not financially exposed.

---

[18] *Fluck v. Blevins*, 969 F.Supp. 1231 (D.Or. 1997).

[19] *Fluck*, 969 F.Supp. at 1233.

[20] Declaration of Karen Weaver in Support of First Specialty's Motion for Summary Judgment, Ex. D, p. 29 of 46.

CHARTER OAK'S RESPONSE TO FIRST SPECIALTY'S AMENDED MOTION FOR SUMMARY JUDGMENT TO DISMISS THIRD-PARTY COMPLAINT - 8
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION

1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

First Specialty and MacLean specifically negotiated the indemnity and hold harmless and MacLean has specifically accepted the financial consequences of Charter Oak's contribution claim.

This case is unlike the *Cadet Manufacturing* and *Fluck* cases cited by First Specialty[21] in which there was no indemnity and hold harmless agreement and the only way for the settling defendant to get the protections felt necessary was to make the settlement contingent upon the court agreeing to issue a claim bar. Here, however, the settlement is unconditional, First Specialty is protected by the indemnity and hold harmless, and First Specialty is not financially exposed.

It simply is not the case that a claim bar is necessary to facilitate settlement. Settlement has already occurred. Rather than "courting disaster" by remaining exposed to a contribution claim, First Specialty has protected itself with the indemnity and hold harmless. The financial consequences of Charter Oak's contribution claim have been shifted to MacLean.

Further, claim bars are not granted without protecting the rights of non-settling insurers, here Charter Oak. For example, in the *Cadet Manufacturing* case cited by First Specialty[22], the court stated it had the inherent equitable power to enter an order precluding subsequent claims for contribution by non-settling parties in the litigation "so long as their rights are protected by it."[23] The court found the settlement reasonable but did so primarily because the settling insurers were paying 42% of the total liability. Here, by contrast, First Specialty has paid 3.3% of the alleged liability.

---

[21] First Specialty's Motion for Summary Judgment, p. 9.

[22] First Specialty's Motion for Summary Judgment, p. 9.

CHARTER OAK'S RESPONSE TO FIRST
SPECIALTY'S AMENDED MOTION FOR
SUMMARY JUDGMENT TO DISMISS THIRD-
PARTY COMPLAINT - 9
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO
DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION

1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

Whatever the situation may be in a case with no indemnity and hold harmless, in this case where there is an indemnity and hold harmless a claim bar would not serve the purpose it was designed to serve. Instead, it would defeat Charter Oak's right to equitable contribution against First Specialty, who contemplated it and protected itself against it, and MacLean, who has agreed to be responsible for it.

### Conclusion

It is respectfully submitted that First Specialty's motion should be denied.

DATED this ____ day of July, 2008.

Mark Thorsrud, WSBA #7951
THORSRUD CANE & PAULICH
1325 Fourth Avenue, Suite 1300
Seattle, WA 98101
206.386.7755
FAX: 206.386.7795
email: mthorsrud@tcplaw.com

Attorneys for Defendant/Third-Party Plaintiff

Thomas Lether
Cole, Lether, Wathen & Leid, P.C.
1000-2nd Avenue, Suite 1300
Seattle, WA 98104

---

[23] *Cadet Manufacturing*, 2006 U.S. Dist. Lexis 22701, p. 2.

CHARTER OAK'S RESPONSE TO FIRST SPECIALTY'S AMENDED MOTION FOR SUMMARY JUDGMENT TO DISMISS THIRD-PARTY COMPLAINT - 10
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO DISMISS 3RD PARTY COMPLAINT.docx

THORSRUD CANE & PAULICH
A PROFESSIONAL SERVICE CORPORATION
1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

**Certificate of Service**

I hereby certify that on ~~July 7, 2008~~ , I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Greg Harper
Todd Hayes
Steven Driggers
Harper | Hayes PLLC
One Union Square
600 University Street, Suite 2420
Seattle, WA 98101

Karen Southworth Weaver
Soha & Lang, P.S.
701 Fifth Avenue, Suite 2400
Seattle, WA 98104

Thomas Lether
Cole, Lether, Wathen & Leid, P.C.
1000-2nd Avenue, Suite 1300
Seattle, WA 98104

_____/s/_____
Mark Thorsrud WSBA #7951
THORSRUD CANE & PAULICH
1325 Fourth Avenue, Suite 1300
Seattle, WA 98101
206.386.7755
FAX: 206.386.7795
email: mthorsrud@tcplaw.com

Attorneys for Defendant/Third-Party Plaintiff

CHARTER OAK'S RESPONSE TO FIRST
SPECIALTY'S AMENDED MOTION FOR
SUMMARY JUDGMENT TO DISMISS THIRD-
PARTY COMPLAINT - 11
Cause No. C 06-1093-JCC
G:\Docs\6\2022\PLD\CO'S RESPONSE TO 1ST SPECIALTY'S AMENDED MSJ TO
DISMISS 3RD PARTY COMPLAINT.docx

**THORSRUD CANE & PAULICH**
A PROFESSIONAL SERVICE CORPORATION

1300 PUGET SOUND PLAZA
1325 FOURTH AVENUE
SEATTLE, WA 98101
(206) 386-7755

Case 2:06-cv-01093-BHS   Document 58   Filed 12/17/2007   Page 1 of 7

Judge Benjamin H. Settle

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MACLEAN TOWNHOMES, LLC, a Washington limited liability company, as assignee of American Heritage Builders, a Washington corporation, | No. CV6 1093 BHS |
| Plaintiff, | DECLARATION OF MARK LAWLESS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO INSURANCE COVERAGE |
| v. | |
| CHARTER OAK FIRE INSURANCE COMPANY, a foreign insurance company, | |
| Defendant. | |

I, MARK LAWLESS, declare as follows:

1.      I am over the age of 18 and am competent to testify to the facts and opinions stated in this declaration.  I have personal knowledge of all facts stated in this declaration unless indicated otherwise.

2.      I am the President of Construction Systems Management Inc. ("CSMI"). CSMI provides construction management and consulting services to owners, builders, and developers, with an emphasis on construction and design issues that affect a structure's "building envelope" – the siding, flashings, windows, roofing, and other building

DECLARATION OF MARK LAWLESS - 1
**CASE #CV 06-1093 BHS**

components that are intended to prevent water intrusion into a building's wall cavity and other interior spaces. CSMI also provides similar forensic consulting services in cases involving alleged construction defects, including at condominium projects.

3.    I have over 35 years of experience in the construction industry, emphasizing construction practices, procedures, and standards, as well as cost estimating. A copy of my curriculum vitae is attached as **EXHIBIT A.**

4.    As a construction defect consultant, I have investigated numerous residential buildings, a majority of which were condominiums or other multi-family residences. Almost all of these investigations involved "intrusive testing" – removing portions of the building's siding, flashing, roofing, deck membranes, or similar materials for the purpose of evaluating (a) the nature of the construction, and (b) the construction's effect on other building components. For example, we might remove the siding, flashings, and weather-resistive barrier around a particular window to determine whether the contractors properly installed those materials or whether the building's framing or sheathing is water damaged at that location.

5.    In MacLean Townhomes, LLC v. America 1st Roofing, et al., King County Cause No. 04-2-06279-9 SEA, MacLean Townhomes, LLC, retained CSMI to investigate conditions at the Summerhill Village Condominium relating to the claims asserted against MacLean Townhomes, LLC by the Summerhill Village Condominium Owners Association.

6.    CSMI performed and participated in intrusive testing on the Summerhill Village Condominium in May of 2004. CSMI made over 75 openings to the Summerhill Village buildings' exterior envelopes to inspect the construction methods used at the

DECLARATION OF MARK LAWLESS - 2

HARPER | HAYES PLLC
One Union Square
600University Street, Suite 2420
Seattle, Washington 98101
Telephone: 206-340-8010

Case 2:06-cv-01093-BHS   Document 58   Filed 12/17/2007   Page 3 of 7

buildings, as well as to evaluate the condition of the underlying building components, such as framing and sheathing.

7.     In addition to supervising these intrusive site inspections, I also reviewed (a) hundreds of photographs taken by the other experts, documenting the intrusive testing performed at Summerhill Village during November 2003; (b) the plans and specifications for the Summerhill Village Condominium; (c) portions of the 1997 Uniform Building Code (which, according to the project plans, governed the Condominium's construction); and (d) the Subcontract between MacLean Townhomes, LLC, and AHB, including the Master Agreement, Project Agreement of Subcontract, Exhibits A through D of the Subcontract, and the Subcontract's Contract Extension.

8.     According to the Scope of Work in Exhibit A to the Subcontract that I reviewed, a true and correct copy of which is attached as **EXHIBIT B**, AHB agreed to install all siding, exterior wood trim, and soffits to the buildings at Phases 2 and 3 of the Summerhill project. AHB's duties included:

    a.    installing building paper on all exterior walls prior to siding installation' in a manner that will provide a weatherproof building envelope;

    b.    installing drip edge flashing over all horizontal wall trim and openings in a manner to divert water away from openings and to avoid puddling.

    c.    placing cedar trim over two layers of building paper at all points where concrete contacts and exterior wall;

    d.    installing wood trim at windows, gables, doors, garage doors, belly bands, meter enclosures, and entry posts at units;

    e.    installing flat surface "blocks" at all hose bibs, fire pump hose connections, light fixtures, alarm devices, dryer vents, building addresses, fireplace outside air inlet vents, electrical outlets, and microwave ducts;

DECLARATION OF MARK LAWLESS - 3

HARPER | HAYES PLLC
One Union Square
600University Street, Suite 2420
Seattle, Washington 98101
Telephone: 206-340-8010

    f.     installing vinyl siding and vinyl shingles; and

    g.     installing vinyl soffits at all cantilevers and entry areas.

9.    The Subcontract also provided that if AHB encountered surfaces unacceptable for the proper application of its work, it had to notify MacLean's Superintendent prior to proceeding with its work. If AHB proceeded with its work without giving notice of unacceptable underlying condition, AHB would be solely responsible for the costs resulting from the underlying condition.

10.    During my intrusive investigation, I observed a variety of defects in the siding, weatherproofing, and flashing work on Phases 2 and 3 of the Summerhill Village Condominium, including:

    a.     Weather resistive barrier ("WRB") at columns and walls was reverse lapped (*i.e.* instead of being installed "shingle style," at certain locations, the bottom layer of WRB was placed over the layer above);

    b.     WRB at columns and walls under-lapped at horizontal and vertical interfaces (the 1997 UBC requires __" horizontal and __" vertical laps);

    c.     WRB was run short of 2" minimum at deck base flashing;

    d.     WRB was run short on the 2" minimum or short of flashing or reverse lapped to step flashings at roofs;

    e.     No metal head flashing and/or penetration wraps at vents and other penetrations;

    f.     WRB had gaps and tears present at all locations opened;

    g.     Metal flashing was placed on top of the WRB or overlap with WRB was beneath 2" minimum requirement;

    h.     Metal flashings, if present, possessed less than a 2" vertical leg;

    i.     Windows, sliding glass doors and man-doors lack metal head flashing;

DECLARATION OF MARK LAWLESS - 4

HARPER | HAYES PLLC
One Union Square
600University Street, Suite 2420
Seattle, Washington 98101
Telephone: 206-340-8010

j.    Column tops that are flush with siding trim missing flashing;

k.    Column tops at building 12 (Phase 2) have a roof interface allowing water intrusion into backside of column;

l.    Flashings are not present at foundation to wall interfaces in vertical planes and at exposed perpendicular foundation wall interfaces;

m.    Boot flashings are not present at privacy walls and framed guard rail walls, at top edge;

n.    WRB not present on all surfaces at privacy walls;

o.    No flashings are present to prevent water intrusion into wall assembly at privacy wall's lattice top;

p.    Guardrail walls at entry deck have no metal flashing present on top of framed wall or under the wood trim;

q.    Wood capped masonry wainscot interface to vinyl or wood siding have flashing that does not extend over the width of the wood or are not present;

r.    Wood caps at masonry or wood clad columns cap-to-siding interface have no flashing;

s.    At wood framed entries at building ends of 3-story buildings only, the belly band wood trim is in direct contact with the concrete walks, resulting in elevated moisture and water intrusion damage;

t.    Wood capped foundation walls at 3-story buildings have flashing that does not extend over the width of the wood, resulting in water damage; and

u.    Water damage throughout Phases 2 and 3, especially at dissimilar material interfaces, such as where siding and decks come together.

11.    Photographic examples of some of the above-referenced deficiencies are attached in **EXHIBITS C** (Phase 2), and **D** (Phase 3).

12.    At various locations throughout Phases 2 and 3, the above-referenced deficiencies in AHB's and its subcontractor's work allowed water penetration through the

DECLARATION OF MARK LAWLESS - 5

HARPER | HAYES PLLC
One Union Square
600University Street, Suite 2420
Seattle, Washington 98101
Telephone: 206-340-8010

buildings' "building envelope" and into the buildings' wood sheathing and framing, which, in turn, stained and otherwise physically injured the wood sheathing and framing. Although the siding was incorrectly installed in places, the siding itself was not physically injured (*i.e.*, the siding itself was not water damaged).

13.    The defects in this siding installation would have begun trapping water behind the buildings' envelopes after AHB and its subcontractor completed these phases. As a result, damage to the underlying wood framing and sheathing likely began in early 2000 for Phase 2, and Fall 2000 for Phase 3, and progressed continuously until it was repaired.

14.    Locating and repairing all of the underlying sheathing and framing that was physically damaged as a result of the defects in AHB's and its subcontractor's siding installation required removing and replacing all of the Phase 2 and 3 buildings' siding, flashings, and WRB.

15.    McBride Construction Resources provided an itemized estimate of the costs to repair the damage identified at the project. I reviewed McBride's estimate and identified the work necessary to repair the damage attributable to the siding work on Phases 2 and 3.

16.    For each specific repair item for damage attributable in some way to Phase 2 or 3 siding work, I calculated from McBride's total estimate for the item the amount attributable solely to the Phase 2 and 3 siding work. I performed these allocations based on the amount of damage associated with the repair item that was observed at Phases 2 and 3 in relation to the amount of damage observed at the entire project. For example, McBride's estimate called for the complete replacement of the project's vinyl siding. Since this

DECLARATION OF MARK LAWLESS - 6

HARPER | HAYES PLLC
One Union Square
600 University Street, Suite 2420
Seattle, Washington 98101
Telephone: 206-340-8010

included all the vinyl siding installed at Phases 2 and 3, I allocated 2/3 of McBride's total replacement estimate for the vinyl siding to AHB.

17.    The September 16, 2004 McBride estimate, and my itemized cost allocation for the damage attributable to AHB, are attached as **EXHIBIT E.**

18.    The $1,779,057.43 sum contained in my allocation represents my conclusion as to the total repair costs attributable to the damage caused by AHB's and its subcontractor's work on Phases 2 and 3. This sum shows the work necessary to find and repair the damaged sheathing and framing—the physically injured work of subcontractors other than AHB.

19.    In forming the opinions in this declaration, I have reviewed and relied upon the following documents:

a.    The contract documents related to the construction of the Summerhill Village Condominium including the plans and specifications;

b.    The scope of repair prepared by Interface Management, a consultant for the Summerhill Village Condominium Owners Association;

c.    The pricing prepared by McBride Construction Resources, including September 16, 2004 and November 15, 2004 estimates, to repair all defects and resulting property damage caused by and arising out of Phases 2 and 3 of the Summerhill Village Condominium; and

I declare under penalty of perjury under the laws of the State of Washington that the above statements are true and accurate to the best of my knowledge.

DATED this 5th day of December, 2007 at ___SEATTLE___, Washington.

_____
Mark Lawless

DECLARATION OF MARK LAWLESS - 7

HARPER | HAYES PLLC
One Union Square
600 University Street, Suite 2420
Seattle, Washington 98101
Telephone: 206-340-8010