UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MACLEAN TOWNHOMES, LLC, a Washington limited liability company, as assignee of AMERICAN HERITAGE BUILDERS, a Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>CHARTER OAK FIRE INSURANCE COMPANY, a foreign insurance company,<br><br>Defendant. | CASE NO. C06-1093BHS<br><br>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER |

This matter comes before the Court on MacLean Townhomes, LLC's ("MacLean") request for a bench trial. The Court, having considered testimony from witnesses during a multiple-day trial, all exhibits admitted at the trial, the parties' post-trial briefs, and the remainder of the file herein, enters these Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

The Court finds as follows:

1. Plaintiff MacLean is a Washington limited liability company.

2. Defendant Charter Oak Fire Insurance Company ("Charter Oak") is a corporation organized under the laws of the State of Connecticut.

ORDER - 1

3. The amount in controversy is in excess of $75,000.

4. On August 23, 1999, American Heritage Builder ("AHB") executed a subcontract with MacLean to install the vinyl siding, weather resistant barrier, flashings, and exterior wood trim for Phases 2 and 3 of the Summerhill Village Condominium (the "Condominium"). In December 1999, AHB completed its work on Phase 2 of the project. On February 23, 2000, MacLean and AHB extended the subcontract to include Phase 3 of the project.

5. Phases 2 and 3 of the Condominium involved 20 buildings and 110 units. AHB's Vice President, Chad Hansen, was the project superintendent overseeing AHB's work on these buildings.

6. Charter Oak insured AHB under two "Commercial General Liability" insurance policies: (1) policy number IO-680-464175-7-COF-99, with an August 18, 1999 through August 18, 2000 policy period and (2) policy number IO-680-464175-7-COF-00, with an August 18, 2000 through August 18, 2001 policy period. Each policy has limits of $1,000,000 for "each occurrence" and $2,000,000 in the "aggregate."

7. Each policy contains an "Impaired Property Exclusion" that reads as follows:

> m. Damage to Impaired Property or Property Not Physically Injured
> "Property damage" to "impaired property" or property that has not been physically injured arising out of:
> (1) A defect, deficiency, inadequate or dangerous condition in "your product" or "your work"; or
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

"Impaired property" means:

> tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

    a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
    b. You have failed to fulfill the terms of a contract or agreement;
if such property can be restored to use by:
    a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
    b. Your fulfilling the terms of the contract or agreement.

8. After the Condominium's construction, the Summerhill Village Condominium Homeowners Association ("HOA") notified MacLean about alleged construction defects and resulting property damage at the Condominium.

9. MacLean settled with the HOA for $3,759,254.

10. On March 23, 2004, MacLean filed suit against AHB and other subcontractors.

11. Charter Oak engaged Steve Wraith to provide a defense for AHB in that action.

12. In the months that followed, MacLean, AHB, and Charter Oak conducted various inspections and developed different reports on the scope of work and cost of repairs necessary to correct the alleged deficiencies in AHB's work. Chad Hansen attended and participated in some of these inspections.

13. There were construction defects in AHB's work in virtually all of the buildings that were part of Phases 2 and 3 of the Condominium project.

14. Chad Hansen, however, stood behind AHB's work and declared that AHB was not responsible for any construction defect.

15. AHB's faulty installation of weather resistant barrier paper ("WRB") allowed water to seep behind the paper. This intrusion began in 2001 when the buildings were exposed to rain water and the water intrusion, upon contact, damaged the underlying sheathing and framing. The water damage was an ongoing process.

16. MacLean hired other subcontractors to complete the roofing, decking, columns and concrete portions of the Condominiums. Those contractors were also responsible for construction defects at the points of transition between their work and

1 AHB's work. Some of the defective construction at these points of transition was
2 attributable to defective design.

3     17.    Virtually all of the damage to the building components under the siding
4 occurred at either the aforementioned points of transition at the points of penetration such
5 as windows, dryer vents and electrical fixtures. Regardless of the specific location of the
6 identified damage, AHB was at least partially responsible for the damage because of its
7 defective workmanship. Although AHB misapplied the WRB over the majority of the
8 buildings' surface areas (commonly referred to as the "field"), there was no clearly
9 identified damage to the sheathing or building components underneath the siding and the
10 WRB in the "field."

11     18.    Based on the multiple building investigations, the scope of repairs for
12 AHB's defective work and the resulting damage to the underlying building components
13 ranged from $127,955.80 to $1,820,549.82. This wide variation in estimates was the
14 result of disagreements among the construction defect investigators as to whether a full
15 strip and re-clad of the buildings was a necessary remedy, not only to repair the defective
16 work, but also to protect the buildings from future water intrusion. A partial strip and re-
17 clad was, and generally is, an acceptable remedy for defective construction that involves
18 improperly installed WRB. At the Condominiums, a partial strip and re-clad would have
19 remedied AHB's defective work that resulted in identified property damage to some of
20 the underlying framing and sheathing.

21     19.    Range and Associates NW Division prepared a Draft Scope of Repair for
22 AHB that proposed repairing only the points of penetration at windows, dryer vents and
23 electrical fixtures. This was based on the conclusion that AHB was only responsible for
24 theses areas of damage. The Draft Scope of Repair was also based on a partial strip and
25 reinstallation of siding on the Condominium buildings. The accompanying Draft Scope
26 of Repair Costs estimated that this repair would cost $127,955.80. This was a competent
27 and reasonable estimate of a scope of repair and resulting estimated cost. Richard Witte,

1 who is employed at McBride Construction Resources, provided competent and reliable
2 testimony at the Reasonableness Hearing held before this Court on September 9 through
3 September 12, 2008 ("Reasonableness Hearing"). Mr. Witte estimated that the cost of
4 repairs for the damaged sheathing and framing that was attributable to defective AHB
5 work was $75,000.00. There was no competent and reliable estimate for work necessary
6 to only strip the siding and re-clad at the points of repair identified by Mr. Witte.
7 Therefore, based upon the evidence presented at the Reasonableness Hearing and the
8 Liability and Coverage Trial, the total cost to repair AHB's defective work that resulted
9 in damage to the underlying building components on the Phase 2 and Phase 3 buildings
10 and the underlying building components themselves, would be $202,955.80.

11     20. On September 24, 2004, MacLean demanded $1,833,348.30 from AHB to
12 settle the action, which was the total of $1,820,549.82 for repair/damages and $12,798.48
13 for AHB's share of fees and costs in the MacLean\HOA action.

14     21. On December 17, 2004, MacLean and AHB held a mediation.

15     22. In advance of the mediation, Mark Thorsrud, Charter Oak's coverage
16 attorney, had asked Richard Dykstra, AHB's privately retained attorney, for Mr. Wraith's
17 evaluation of MacLean's claim. Mr. Thorsrud did not receive a response. Moreover, no
18 one representing AHB made a request to Charter Oak for settlement authority.

19     23. Mr. Wraith was not consulted about the scheduling of the mediation and
20 was unable to attend the mediation. Mr. Wraith sent an associate attorney in his stead.

21     24. Mr. Thorsrud attended the mediation; however, he was isolated in a room
22 by himself and was never contacted by anyone, including the mediator, during the
23 meditation.

24     25. Maclean and AHB, however, did work out terms of a tentative settlement
25 agreement. Those terms were that: (1) AHB would accede to MacLean's full demand in
26 the amount of $1,806,219.06; (2) the stipulated judgment would include a covenant by

1  MacLean not to execute on the judgment against AHB; and (3) AHB would assign to
2  MacLean the rights of its insurance claim against Charter Oak.

26. AHB's president, Gary Hansen, did not think that anyone would have to pay the $1,806,219.06 settlement amount or that the amount was a reasonable figure.

27. Until the settlement agreement, AHB stood behind its work and denied responsibility for the construction defects and resulting damage.

28. On January 7, 2005, Mr. Dykstra informed Mr. Wraith that MacLean and AHB had settled.

29. On March 3, 2005, MacLean and AHB entered into a Settlement Agreement, Assignment of Rights and Covenant Not to Execute. As part of that agreement, AHB stipulated to a judgment in favor of MacLean in the amount of $1,806,219.06. In addition, AHB assigned to MacLean all of AHB's contractual and extra-contractual claims and causes of action against its liability insurers, including Charter Oak. In return, MacLean agreed to enforce the stipulated judgment only against AHB's insurance companies.

30. Both Charter Oak and AHB could have worked more closely together to resolve the Maclean suit against AHB. While each could have performed better in connection with a achieving a mutually acceptable resolution, there was no bad faith conduct on the part of either party. However, at the Reasonableness Hearing the Court concluded that MacLean had failed to show that the $1,833,348.30 settlement amount was reasonable and reduced the settlement amount by $633,348.30 to $1.2 million.

31. At some point in the fall of 2004 it was apparent to Charter Oak that AHB was likely liable for some damages resulting from its defective workmanship. However, it was not reasonably certain as to the actual exposure AHB had for property damage caused by such workmanship. The trial in the lawsuit at the time of the demand from MacLean was many months away and pretrial discovery was in its early stages. Charter Oak was not in a position this early in the litigation to provide settlement authority where

there was no reasonable certainty as to the extent of AHB's liability or as to the extent any ultimate liability was covered under its insurance contract with AHB.

## II. DISCUSSION AND CONCLUSIONS OF LAW

MacLean requested a bench trial on two issues:

> (1) whether Defendant Charter Oak acted in bad faith and violated Washington's Consumer Protection Act by, among other things, failing to attempt in good faith to settle the underlying claims against American Heritage Builders, Inc. ("AHB"), and
> 
> (2) whether the judgment against AHB constitutes "sums that [AHB] is legally obligated to pay because of [covered] property damage."

Dkt. 246 at 1.

### A. Jurisdiction

Under 28 U.S.C. § 1332, a federal court has original jurisdiction over a civil action involving corporations of different states and where the amount in controversy exceeds $75,000. Article III of the United States Constitution, however, limits the jurisdiction of federal courts to cases and controversies. Under Article III, courts use the doctrine of standing "to identify those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). To satisfy Article III standing, MacLean must demonstrate that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Most importantly, "the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000).

Charter Oak argues that MacLean lacks standing to bring this lawsuit. Dkt. 303 at 34-35. The parties agree that, as AHB's assignee, MacLean stands in the shoes of AHB. Dkt. 307 at 1. Charter Oak, however, claims that AHB suffered no harm because it

ORDER - 7

settled with MacLean and was not exposed to liability. *Id*. at 3. Charter Oak also claims that MacLean was fully compensated by MacLean's insurance companies for its injury in the settlement with HOA. *Id*. Charter Oak concludes that MacLean has not established an injury in fact as either assignee or assignor. *Id*. at 3-4.

The Court concludes as follows:

<u>Conclusion of Law 1</u>: The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

<u>Conclusion of Law 2</u>: MacLean has established an injury in fact as assignee of AHB's contract claims against AHB's insurance company, Charter Oak. The contractual and/or financial relationship between MacLean and its insurance companies are not issues before this Court. Moreover, the Court is unaware of any binding authority that holds that an assignee must establish an injury in fact beyond the alleged injury of the assignor. Therefore, MacLean has standing to bring this action because AHB was subject to a consent judgment and had a valid claim against its insurance company Charter Oak.

**B.     Bad Faith and Washington Consumer Protection Act**

MacLean claims that Charter Oak committed bad faith by (1) failing to make a good faith attempt to settle and (2) by failing to ascertain whether AHB would contribute to settlement. Dkt. 302 at 12-16. MacLean argues that "the same conduct that establishes [its] 'bad faith' claims also establishes its [Consumer Protection Act] claims." Dkt. 246 at 3-4, n.4.

Independent of whether an insurer must provide coverage, an insured may bring a claim for violation of the Washington Consumer Protection Act and bad faith. *Coventry Associates v. American States Ins. Co.*, 136 Wn.2d 269, 279 (1998) (an insurer's duty of good faith is separate from its duty to indemnify if coverage exists); *Anderson v. State Farm Mutual Ins. Co.*, 101 Wn. App. 323, 329 (2000) (an insurer owes a statutory duty of good faith to its insured). To prevail on a Consumer Protection Act claim, MacLean must show: (1) an unfair or deceptive practice; (2) in trade or commerce; (3) that impacts the

public interest; (4) which causes injury to the party in his business or property; and (5) which injury is causally linked to the unfair or deceptive act. *Indus. Indem. Co. v. Kallevig*, 114 Wn.2d 907, 920-921 (1990). Failure to meet any one of these elements under the CPA is fatal to the claim. *Sorrel v. Eagle Healthcare*, 110 Wn. App. 290, 298, (2002).

An insured can show an unfair or deceptive practice that impacts the public interest by establishing a violation of the regulations related to unfair insurance company practices as set forth in the Washington Administrative Code Chapter 284-30, Unfair Claims Settlement Practices. *Dombrosky v. Farmers Ins. Co.*, 84 Wn. App. 245, 260 (1996). Relevant unfair or deceptive acts or practices that are "specifically applicable to the settlement of claims" are as follows:

> (6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear. In particular, this includes an obligation to effectuate prompt payment of property damage claims to innocent third parties in clear liability situations. If two or more insurers are involved, they should arrange to make such payment, leaving to themselves the burden of apportioning it.

WAC 284-30-330(6).

"The determinative question is reasonableness of the insurer's actions in light of all the facts and circumstances of the case." *Anderson*, 101 Wn. App. at 329-330 (citing *Kallevig*, 114 Wn.2d at 920). "[A] reasonable basis for denial of an insured's claim constitutes a complete defense to any claim that the insurer acted in bad faith or in violation of the Consumer Protection Act." *Dombrosky*, 84 Wn. App. at 260 (citing *Transcontinental Ins. Co. v. Wash. Pub. Util. Dists'. Util Sys.*, 111 Wn.2d (1988)). "[A]cts performed in good faith under an arguable interpretation of existing law do not constitute unfair conduct violative of the consumer protection law." *Leingang v. Pierce County Medical Bureau*, 131 Wn.2d at 155.

### 1. Good Faith Attempt to Settle

The Court concludes as follows:

ORDER - 9

<u>Conclusion of Law 3</u>: MacLean has failed to show either that, before the MacLean/AHB settlement occurred, Charter Oak's investigation disclosed a reasonable likelihood that AHB was liable for covered damages or the extent of those possible covered damages, or that Charter Oak acted unreasonably in light of the particular facts of this case. Therefore, MacLean has failed to show that Charter Oak acted in bad faith by failing to make an attempt to settle.

### 2. Ascertain a Contribution to Settlement

"When a settlement offer exceeds the primary insurer's policy limits, the insurer must communicate the offer to its insured, ascertain whether the insured is willing to make the necessary contribution to the settlement amount, and must exercise good faith in deciding whether to pay its own limits." *Truck Ins. Exch. v. Century Indemn. Co.*, 76 Wn. App. 527, 534 (1995) (citing *Continental Cas. Co. v. United States Fid. & Guar. Co.*, 516 F. Supp. 384, 387-88 (N.D. Cal.1981)).

The Court concludes as follows:

<u>Conclusion of Law 4</u>: MacLean has failed to show that Charter Oak did not make a good faith effort to ascertain a contribution to settlement. Although MacLean made a $1.8 million settlement demand relatively early in the course of the litigation, AHB's liability and Charter Oak's coverage were not reasonably clear at that time. AHB's president, Gary Hanson, testified that the $1.8 million offer was unreasonable and that he thought no one would ever have to pay it. Moreover, the record shows that there was a lack of effective communication between Charter Oak and AHB regarding liability, mediation preparation, and settlement negotiations. The fault for this lack of better communication can be shared by both the insurer and the insured. In light of all the facts and circumstances, Charter Oak did not act in bad faith by failing to ascertain a contribution to settlement.

**C. Coverage**

In Washington, evaluating coverage is a two-step process: "The insured must first establish that the loss falls within the 'scope of the policy's insured losses.' Then, to avoid responsibility for the loss, the insurer must show that the loss is excluded by specific language in the policy." *Diamaco, Inc. v. Aetna Cas. & Sur.*, 97 Wn. App. 335, 337 (1999).

### 1. The Claimed Loss and Scope of the Policy

The Washington Supreme Court has held that "once a policy is triggered, the policy language requires insurer to pay all sums for which the insured becomes legally obligated, up to the policy limits." *American Nat. Fire Ins. Co. v. B & L Trucking and Const. Co., Inc.*, 134 Wn.2d 413, 429 (1998). "When the insurer had an opportunity to be involved in a settlement fixing its insured's liability, and that settlement is judged reasonable by a judge, then it is appropriate to use the fact of the settlement to establish liability and the amount of the settlement as the presumptive damage award for purposes of coverage." *Mutual of Enumclaw Ins. Co. v. T & G Const., Inc.*, No. 80420-6, slip op. at 12 (Wash. Oct. 23, 2008).

The Court concludes as follows:

<u>Conclusion of Law 5</u>: The water intrusion at the Condominiums began and caused damage to underlying building components during Charter Oak's coverage period. Therefore, Charter Oak's policy was triggered and Charter Oak is legally obligated to pay sums under that policy.

<u>Conclusion of Law 6</u>: MacLean's presumptive measure of damages is $1.2 million.

### 2. Exclusions

Presumptive damages, however, "are not necessarily the covered damages." *T & G*, slip op. at 12. The insurer may properly litigate coverage exclusions in a coverage action. *Id.* at 13. However, if there is underlying property damage to building

ORDER - 11

components that is covered by the policy, then "removing and repairing the siding is simply part of the cost of repairing the damage to the interior walls." *Id*. at 16.

The Court concludes as follows:

<u>Conclusion of Law 7</u>: Charter Oak has shown that there was neither impaired property nor damaged property in the "field" portions of the buildings. In other words, the damaged building components were limited to the column and deck interface portions of the buildings, as well as at the aforementioned points of penetration.

<u>Conclusion of Law 8</u>: The insurance policies only cover these damaged underlying building components and the reasonable costs associated with removing and repairing the siding that covers the components.

<u>Conclusion of Law 9</u>: The cost of repairing the damaged underlying building components and the associated siding was $202,955.80.

## III. ORDER

Therefore, it is hereby

**ORDERED** that the Court finds for Plaintiff MacLean in the amount of $202,955.80.

DATED this 21st day of November, 2008.

BENJAMIN H. SETTLE
United States District Judge